**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| DON FORTE, | : | Case No. 1:22-cv-314 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| PETER CREMER | : | |
| NORTH AMERICA, LP, | : | |
| | : | |
| Defendant. | : | |

---

### ORDER AND OPINION

---

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 36). Plaintiff filed a Response in Opposition (Doc. 46), to which Defendant filed a Reply in Support (Doc. 47). Thus, this matter is fully briefed and ripe for the Court's review. For the following reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 36).

### FACTUAL BACKGROUND

This employment case centers around Defendant Peter Cremer North America, LP allegedly terminating one of its employees, Plaintiff Don Forte, due to his age and as retaliation for making complaints about racially offensive language in the workplace.

### I.     Defendant's Operations and Structure

Defendant Peter Cremer North America, LP is an oleochemical manufacturer and product supplier based in Cincinnati, Ohio. (Johnson Decl., Doc. 36-2, Pg. ID 703.) Defendant's facilities include a production plant that manufactures the products and a

bottling plant that packages the products for its customers. (*Id.*) This case revolves around the production plant. In order to ensure continuous operations, production workers are divided into four rotating 12-hour shifts. (*Id.* at Pg. ID 703-04.) The A and B shifts are "day shifts" while the C and D shifts are "night shifts." (Reed Dep., Doc. 25, Pg. ID 295.)

Plaintiff Don Forte was hired by Defendant in May 2018 as the production supervisor for the D shift. (Forte Dep., Doc. 23, Pg. ID 162, 165.) In this role, Plaintiff was the "top person" present at night for that particular shift. (Reed Dep., Doc. 25, Pg. ID 297.) Plaintiff supervised the following employees: multiple production operators, a floor lead, and a shift lead. (Organizational Chart, Doc. 35-1, Pg. ID 633.) Specifically, he was responsible for overseeing the operation of D shift, coordinating staff, keeping the production belts in operation, and connecting with the production manager and plant manager when needed. (Johnson Decl., Doc. 36-2, Pg. ID 704; Reed Dep., Doc. 25, Pg. ID 304.) However, production supervisors were not expected to keep all five production belts operational when understaffed. (Harvey Dep., Doc. 27, Pg. ID 363.) And, in Plaintiff's view, he was not solely responsible for ensuring that his shift was properly staffed. (Forte Dep., Doc. 23, Pg. ID 200.)

Plaintiff had a couple different supervisors during his tenure. William Harvey served as the production plant manager, and he was Plaintiff's first direct supervisor. (Harvey Dep., Doc. 27, Pg. ID 368; Forte Dep., Doc. 23, Pg. ID 168-69.) Plaintiff's direct supervisor was thereafter the production manager, who was tasked with monitoring and maintaining the performance of all the shifts. (Reed Dep., Doc. 25, Pg. ID 299.) A lapse in production longer than one hour would necessitate the production manager to outline

2

this to the client, as well as the root cause of the downtime and the actions taken to remedy the situation. (*Id.* at Pg. ID 300.) Raymond Godfrey served in this role starting sometime in 2018. (Godfrey Dep., Doc. 35, Pg. ID 607-08.) Matthew Reed then became the production manager in June 2020. (Reed Dep., Doc. 25, Pg. ID 298.)

## II.    Plaintiff's Background

Prior to working for Defendant, Plaintiff graduated high school and gained 23 years of experience at Fidelity Investments, including as the Director of Manufacturing and Operations. (Forte Dep., Doc. 23, Pg. ID 161-62.) He also earned his Six Sigma Black Belt, which is a certification in manufacturing operations. (*Id.* at Pg. ID 161.) Initially, Plaintiff interviewed for a position in the bottling plant, but he was not ultimately selected for that position. (Godfrey Dep., Doc. 35, Pg. ID 607, 612.) Raymond Godfrey—who served as the plant manager of the bottling plant at the time—was unsure of how Plaintiff's prior experience would translate to manufacturing. (*Id.* at Pg. ID 612.)

Then, William Harvey—the plant manager for the production facility—interviewed Plaintiff for production supervisor. (Harvey Dep., Doc. 27, Pg. ID 372.) This position listed a high school diploma and "at least 3 years of experience in the field or related area" as requirements. (Job Posting, Doc. 23-1, Pg. ID 240.) Harvey noted that Plaintiff's previous experience included continuous improvement. (Harvey Dep., Doc. 27, Pg. ID 372.) Godfrey was also involved in the interview. (Forte Dep., Doc. 23, Pg. ID 164-65.) Ultimately, Harvey decided to hire Plaintiff as a production supervisor in May 2018. (Harvey Dep., Doc. 27, Pg. ID 371.)

### III.    Plaintiff Reports Offensive Racial Language

Throughout his career as a production supervisor, Plaintiff repeatedly reported hearing offensive language and music in the workplace. In Plaintiff's estimation, the work environment surpassed the level of "hostile." (Forte Dep., Doc. 23, Pg. ID 231.) Another employee, Dujuan Wallace, also testified that employees would use the "n-word." (Wallace Dep., Doc. 33, Pg. ID 559.)

Soon after starting in May 2018, Plaintiff reported to Harvey that racially offensive and intimidating language was being used by his coworkers. (Forte Dep., Doc. 23, Pg. ID 169-170, 174; Harvey Dep., Doc. 27, Pg. ID 361-62.) Harvey responded by cutting him off and saying, "I listen to Tupac, too." (Forte Dep., Doc. 23, Pg. ID 170-71.) According to Harvey's account, he responded this way within the context of music, and he then tried to block offensive music in the workplace. (Harvey Dep., Doc. 27, Pg. ID 361-62.) In early 2019, the "n-word" was written in the men's restroom. (Rindler Dep., Doc. 29, Pg. ID 414.)

Sometime in 2019, Plaintiff asked Maggie Rindler, who worked in human resources, whether anyone would do anything about the "N word, the F word, and the B word" being used in the workplace. (Forte Dep., Doc. 23, Pg. ID 174, 214.) For her part, Rindler only recalls Plaintiff complaining to her about music. (Rindler Dep., Doc. 29, Pg. ID 414.) Though Plaintiff complained of the language, he did not want Rindler to convey the contents of the conversation to Harvey. (Forte Dep., Doc. 23, Pg. ID 214.) Plaintiff expressed to Rindler that he was complaining about the language being used in the workplace, but he did not complain about Harvey because he feared retaliation. (*Id.*)

As early as June 2020, shortly after Reed became Plaintiff's new supervisor, Plaintiff reported his concerns about the racially offensive language to Reed. (Forte Dep., Doc. 23, Pg. ID 175.) Reed responded, "Don, they've been talking that way around here for years." (*Id.*) Godfrey also recalls times when Plaintiff brought up certain language used in the plant, but Plaintiff testified that he did not raise concerns of racial language to Godfrey. (Godfrey, Doc. 35, Pg. ID 621; Forte Dep., Doc. 23, Pg. ID 213-14.) Plaintiff did not formally discipline individuals under his supervision for using language he considered inappropriate because he believed he lacked the support from upper management and was fighting the behavior alone. (Forte Dep., Doc. 23, Pg. ID 174-75.)

## IV. The "Happy Birthday" Comment

During Plaintiff's birthday month in 2020, Harvey walked up to Plaintiff and said, "Happy birthday, Don, 57?" (Forte Dep., Doc. 23, Pg. ID 172.) While Plaintiff was turning 60 years old rather than 57, he was born in the year 1957. (*Id.*) Harvey made this comment in a crowded break room, and Plaintiff did not report this comment. (*Id.*) Multiple other people wished Plaintiff a happy birthday during his birthday month. (*Id.*)

## V. Plaintiff's Performance and Termination

Plaintiff received marks of "meets expectations" in most categories of his first performance review for the year of 2018. (2018 Performance Review, Doc. 35-2, Pg. ID 636-47.) However, Plaintiff received formal coaching from Godfrey in September 2018 for failure to properly staff his shift, failure to properly fill out paperwork, failure to report a product spill, and failure to maintain a safe and clean workspace. (Formal Coaching Plan, Doc. 23-2, Pg. ID 242-43.) Around three months later, Plaintiff received a formal

5

verbal warning from Godfrey for failing to follow procedures, which caused a freeze in operations. (Verbal Warning, Doc. 23-3, Pg. ID 244-45.) Turning to his work performance during the year of 2019, Plaintiff received an overall performance review of failing to meet expectations. (2019 Performance Review; Doc. 23-13, Pg. ID 265-73.)

Plaintiff was cited three times for policy violations throughout 2020. On June 25, 2020, Plaintiff did not show up to work, and he only requested a vacation day one hour into his shift. (Attendance Violation, Doc. 23-4, Pg. ID 246-47; Forte Dep., Doc. 23, Pg. ID 182.) This violated company policy because vacation requests needed to be made at least 24 hours in advance. (Attendance Violation, Doc. 23-4, Pg. ID 246-47.) This violation was cited as a written warning. (*Id.*)

Then, on July 15, 2020, Plaintiff continued to work a 12-hour shift despite knowing his temperature registered as a fever when he began his shift. (Forte Dep., Doc. 23, Pg. ID 191-92.) Though Plaintiff's temperature registered lower at a later time, Defendant's COVID policy required that he leave. (*Id.*) Plaintiff continued to work and was suspended for this violation. (*Id.*; Suspension, Doc. 23-9, Pg. ID 256-57.) Another production supervisor, as well as a production manager, in the bottling plant were both similarly suspended for violating Defendant's COVID policy. (Johnson Dep., Doc. 31, Pg. ID 470-71.)

Plaintiff's third policy violation took place on the D shift that spanned from the night of September 4, 2020, into the following morning ("the September incident"). (Reed Dep., Doc. 25, Pg. ID 312-14.) That particular shift was a "complete mess." (*Id.* at Pg. ID 314.) There were spills, incomplete paperwork, and eight bags of scrapped product.

6

(Termination Letter, Doc. 23-11, Pg. ID 262-63.) Plaintiff was accompanied by ten employees that night, but one of Plaintiff's supervisees left mid-shift. (Reed Dep., Doc. 25, Pg. ID 312.) Two production belts were down for at least three hours. (Forte Dep., Doc. 23, Pg. ID 195; Termination Letter, Doc. 23-11, Pg. ID 262-63.) While Plaintiff was required to notify the production manager anytime a belt was down for more than three hours, Plaintiff failed to do so. (Forte Dep., Doc. 23, Pg. ID 196.) Two of Plaintiff's supervisees present that night were Dujuan Wallace—the shift lead—and Mike Mason—the floor lead. (Reed Dep., Doc. 25, Pg. ID 305.) Although both Wallace and Mason failed to complete certain tasks that night, neither ultimately received discipline. (*Id.* at Pg. ID 315; Discipline Drafts for Wallace and Mason, Doc. 25-9, Pg. ID 334-39.)

Plaintiff received his termination letter on September 22, 2020. (Termination Letter, Doc. 23-11, Pg. ID 261-63.) The letter cited the September incident, Plaintiff's 2019 performance review, attendance violation, and COVID violation as reasons for termination. (*Id.*) About one month after Plaintiff's termination, Reed and Harvey promoted Wallace to Plaintiff's former position as D-shift production supervisor. (Wallace Dep., Doc. 33, Pg. ID 558.) Wallace was 42 years old at the time, while Plaintiff was 63. (Response to Interrogatories, Doc. 44-2, Pg. ID 783; Forte Dep., Doc. 23, Pg. ID 172.) Plaintiff concluded that his termination was the end result of a discriminatory and retaliatory "campaign" against him by Harvey and Reed. (Forte Dep., Doc. 23, Pg. ID 205.)

7

## PROCEDURAL HISTORY

On June 2, 2022, Plaintiff filed the Complaint with the following claims: (1) Age Discrimination under Ohio Law; (2) Age Discrimination under the Age Discrimination in Employment Act; (3) Race Discrimination under Ohio Law; (4) Race Discrimination under Title VII; (5) Retaliation under Ohio Law; (6) Interference and Retaliation under Emergency Family and Medical Leave Expansion Act ("EFMLEA"); and (7) Interference and Retaliation under Emergency Paid Sick Leave Act ("EPSLA"). (Compl., Doc. 1, ¶¶ 42-91.) Plaintiff has since abandoned Counts Six and Seven for Interference and Retaliation under EFMLEA and EPSLA. (*See* Motion to Dismiss, Doc. 18, Pg. ID 84.) Defendant filed its Motion for Summary Judgment (Doc. 36) as to the remaining claims on May 24, 2024.

## LAW

A court must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, it then becomes the nonmoving party's responsibility to put forth specific facts to demonstrate a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

Moreover, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). To preclude summary judgment, the nonmoving party must point to probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52. If the nonmoving party fails to make the necessary showing for an element on which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## ANALYSIS

As a preliminary matter, the Court notes that Plaintiff has abandoned his race discrimination claims by not contesting them in his Response to Defendant's Motion for Summary Judgment (Doc. 46). *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). Thus, the Court grants summary judgment for Defendant on Plaintiff's race discrimination claims and proceeds to the merits of Plaintiff's remaining age discrimination and retaliation claims.

### I.    Age Discrimination Claims

Defendant first moves for summary judgment on Plaintiff's age discrimination claims under federal and Ohio law. Courts analyze such claims together under the federal standard due to the similarities between the statutes. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012); 29 U.S.C. § 623(a)(1); Ohio Rev. Code § 4112.02(A). In order to proceed with an age discrimination claim, a plaintiff must offer evidence that the employer would not have taken the adverse action in question but-for the employee's age. *Blizzard*, 698 F.3d at 238. A plaintiff may achieve this by offering circumstantial

evidence through the well-traveled *McDonnell Douglas* burden-shifting framework. *Id.* (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

Under the first step of *McDonnell Douglas,* a plaintiff must establish a prima facie case of age discrimination. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). If the plaintiff does so, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for the adverse action. *Id.* Assuming the defendant accomplishes this, the burden shifts back to the plaintiff to show why the proffered reason is merely pretext for age discrimination. *Id.*

## 1. **Prima Facie Case**

In the age discrimination context, a "plaintiff establishes his prima facie case by showing that (1) he is a member of a protected group, (2) he was qualified for the position in question, (3) his employer took an adverse employment action against him, and (4) there are 'circumstances that support an inference of discrimination.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020) (quoting *Blizzard*, 698 F.3d at 283). The parties do not dispute that Plaintiff—who was over the age of 40 years old during all relevant times—was a member of a protected group and that he was terminated by Defendant. Thus, only the second and fourth elements are in contention. In proceeding to this analysis, the Court recognizes that a plaintiff's burden in establishing a prima facie case is "easily met" and "not onerous." *Id.* (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)).

### i. Qualified for the Position

Defendant argues that Plaintiff was unqualified for the position of production supervisor because he was performing unsatisfactorily prior to his termination. (Motion, Doc. 36, Pg. ID 687-88; Reply, Doc. 47, Pg. ID 869-871.) Plaintiff counters that his unsatisfactory performance must be analyzed at the pretext stage—as opposed to the prima facie stage—because Defendant uses this same unsatisfactory performance as part of its proffered reason for terminating Plaintiff. (Response, Doc. 46, Pg. ID 837-39.) The Court agrees.

As the Sixth Circuit instructs, courts "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case" because this would "bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc); *see also Provenzano*, 663 F.3d at 813 (cautioning courts to not "conflate the prima facie and pretext stages" in this context). Here, Plaintiff's termination letter included his 2019 performance review, as well as "previous performance concerns," as among the reasons for termination. (Termination Letter, Doc. 23-11, Pg. ID 263.) These performance issues are therefore better saved for the question of pretext.

As for this stage, courts "should focus on [objective] criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Wexler*, 317 F.3d at 576. At bottom, "[t]he prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence

11

that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id.* at 575– 76.

Prior to his employment with Defendant, Plaintiff had gained over two decades of experience with Fidelity Investments, including as the Director of Manufacturing and Operations. (Forte Dep., Doc. 23, Pg. ID 162.) Plaintiff acquired a Six Sigma Black Belt—a manufacturing operations certification—before joining Defendant's workforce. (*Id.* at Pg. ID 161.) He is also a high school graduate. (*Id.*) Defendant argues that Plaintiff's prior work experience did not transfer to the manufacturing setting and that the certification was no substitute for experience. (Reply, Doc. 47, Pg. ID 870.) Specifically, Defendant points to Godfrey's refusal to hire Plaintiff for a different position in the bottling plant because he was unsure how Plaintiff's background would translate to manufacturing. (Godfrey Dep., Doc. 35, Pg. ID 612.) But, as to the relevant position here, it is worth noting that the job posting for the production supervisor position included a high school diploma and "at least 3 years of experience in the field or related area" as position requirements. (Job Posting, Doc. 23-1, Pg. ID 240.) Furthermore, as to his 2018 performance review, Plaintiff received marks of "meets expectations" in nearly every category by Godfrey. (2018 Performance Review, Doc. 35-2, Pg. ID 636-47.) Accordingly, given this record, a reasonable juror may find that Plaintiff was qualified for his position prior to the onset of the purported performance issues and policy violations that Defendant cites as its reasons for termination.

12

### ii.     Inference of Age Discrimination

As to the fourth element, a plaintiff can put forward an inference of age discrimination by showing either that the employer replaced him with a younger employee or, alternatively, that the employer treated non-protected but similarly-situated employees more favorably. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521-22 (6th Cir. 2008). Defendant contests this element because Plaintiff was replaced by Wallace—who was over forty years old at the time and therefore also a member of the protected class. (Motion, Doc. 36, Pg. ID 691.) This is true. But, because Wallace was twenty years younger than Plaintiff, the replacement of Plaintiff by Wallace permits an adequate inference of age discrimination. (*See* Response to Interrogatories, Doc. 44-1, Pg. ID 783; Forte Dep., Doc. 23, Pg. ID 172.) After all, "[a]ge differences of ten or more years have generally been held to be sufficiently substantial to meet the requirement of the fourth part of age discrimination prima facie case." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (collecting cases). Thus, the fourth and final prong of the prima facie case is met.

### 2. Legitimate Reason for Adverse Action

Since Plaintiff met his burden of putting forth a prima facie case of age discrimination, the burden shifts to Defendant to proffer a legitimate, nondiscriminatory reason for the adverse decision. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). Defendant states that it terminated Plaintiff for policy violations and poor performance. (Termination Letter, Doc. 23-11, Pg. ID 261-63.) These are both legitimate, nondiscriminatory reasons for termination. *See Schwendeman v. Marietta City Sch.*, 436 F.

Supp. 3d 1045, 1061 (S.D. Ohio 2020) ("[V]iolations of express company policies are legitimate, non-discriminatory reasons for taking adverse employment action."); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008) ("Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment . . . ."). Defendant has therefore met its burden at this stage.

### 3. Pretext

The question now becomes whether Plaintiff "present[ed] evidence from which a jury could reasonably find that the employer's proffered reason for the adverse employment action was not the real reason that it discharged [him] and that unlawful age discrimination was the true reason." *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 347 (6th Cir. 2015). Plaintiff may accomplish this by demonstrating that the stated reason "(1) has no basis in fact, (2) did not actually motivate the adverse employment decision, or (3) was insufficient to motivate discharge." *Id.* These categories are not meant to unduly restrict a court's analysis of the ultimate inquiry: "did the employer fire the employee for the stated reason or not?" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quotation omitted). At the summary-judgment stage, a plaintiff "need only rebut the employer's proffered rationales," not disprove them. *Moffat*, 624 F. App'x at 348.

### i.  Basis in Fact

As an initial matter, it appears that Plaintiff contests some of the facts concerning Defendant's proffered reason for his termination. First, Plaintiff points out that the termination letter falsely noted that there were twelve people on shift and that he should have been able to operate with at least ten operators. (Response, Doc. 46, Pg. ID 842-43;

14

Termination Letter, Doc. 23-11, Pg. ID 261-63.) In his deposition, Reed does not dispute that there were nine employees with Plaintiff during the September incident once one of the operators that Plaintiff supervised left mid-shift. (Reed Dep., Doc. 25, Pg. ID 312.) Still, independent of the number of employees, Plaintiff admits that he violated company policy by not escalating the situation to the production manager when the belts were down for over three hours. (Forte Dep., Doc. 23, Pg. ID 195-96.)

Second, Plaintiff further challenges that the termination letter falsely cites that the belt was down for up to four and a half hours. (Response, Doc. 46, Pg. ID 842; Termination Letter, Doc. 23-11, Pg. ID 262-63.) But, even taking Plaintiff's version of events as true, this does not create a genuine dispute as to a material fact. Plaintiff, after all, agrees that belt one was down for at least three hours and belt two was down for approximately three and a half hours. (Forte Dep., Doc. 23, Pg. ID 195.) As the production supervisor for the shift, Plaintiff was required to "escalate" the situation by contacting the production manager whenever a belt was down for at least three hours. (*Id.* at Pg. ID 196; Escalation Plan, Doc. 23-12, Pg. ID 264.) Plaintiff admits that he failed to escalate the situation until the end of his shift. (Forte Dep., Doc. 23, Pg. ID 196.) Accordingly, neither of Plaintiff's factual contentions as to the September incident materially affects Plaintiff's admission to the underlying policy violation—his failure to escalate.

At this juncture, the Court finds it appropriate to further examine the other issues cited by Defendant as its reasons for termination and Plaintiff's corresponding admissions.

Turning to his work performance in 2019, Plaintiff received an overall performance score of failing to meet expectations. (2019 Performance Review, Doc. 23-13, Pg. ID 265-73.) Plaintiff personally disagrees with the overall rating of "needs improvement." (Forte Dep., Doc. 23, Pg. ID 199.) Yet, Plaintiff acknowledged—among other things—that lines were frozen under his supervision and his attendance could have been better. (*Id.* at Pg. ID 200-01.) Not to mention, this performance review was authored by Godfrey, and Plaintiff testified that Godfrey was not part of the "campaign" against him. (*Id.* at Pg. ID 200, 205, 265.) While Plaintiff may believe someone else was supplying Godfrey with these comments and scores, he has not pointed to any evidence to support this. (*Id.* at Pg. ID 201.) Such speculation does not suffice within the context of summary judgment. *See Hunter v. Shield*, 550 F. Supp. 3d 500, 525-26 (S.D. Ohio 2021), *aff'd*, No. 21-3748, 2022 WL 2952583 (6th Cir. July 26, 2022).

On June 25, 2020, Plaintiff did not show up to work, and he requested a vacation day over an hour after his shift began. (Attendance Violation, Doc. 23-4, Pg. ID 246-47.) This violated company policy because vacation requests needed to be made at least 24 hours in advance. (Reed Decl., Doc. 36-4, Pg. ID 712.) And, Plaintiff admits that he violated the vacation policy. (Forte Dep., Doc. 23, Pg. ID 179, 182-83.) Plaintiff also cited one of his own supervisees for an attendance issue on at least one occasion. (*Id.* at Pg. ID 180.)

On July 15, 2020, Plaintiff reported to work with a fever and continued to work a 12-hour shift in disregard for Defendant's COVID policy. (Forte Dep., Doc. 23, Pg. ID 190-91.) Plaintiff was suspended for this violation. (Suspension, Doc. 23-9, Pg. ID 256-57.)

16

Though Plaintiff testified that his temperature decreased throughout the night, he admits that he had a fever and failed to comply with Defendant's COVID protocol by continuing to work. (Forte Dep., Doc. 23, Pg. ID 191-92.) The record also shows that another production supervisor and a production manager were both similarly suspended for violating Defendant's COVID policy. (Johnson Dep., Doc. 31, Pg. ID 470-71.)

### ii. Similarly-Situated Employees

A plaintiff may demonstrate pretext by showing that similarly-situated employees outside of the protected class "engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779-80 (6th Cir. 2016) (quotation omitted). This type of comparison, however, has its limits. As the Sixth Circuit has explained, a plaintiff must demonstrate that the proposed comparator is similar to himself in "all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quotation omitted).

In approaching this question of comparability, courts consider whether the employees dealt "with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). "[T]he weight to be given to each factor can vary depending upon the particular case," and an "exact correlation" with the comparator employee is unnecessary. *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003); *Ercegovich*, 154 F.3d at 352. That being said, the comparison at the pretext stage

17

"must be apples to apples" since a higher standard applies than at the prima facie stage. *Kinch v. Pinnacle Foods Grp., LLC*, 758 F. App'x 473, 479 (6th Cir. 2018).

Plaintiff points to Wallace and Mason as potential comparators. (Response, Doc. 46, Pg. ID 843.) Specifically, Plaintiff argues that his termination was unwarranted because Wallace and Mason failed to carry out their respective duties during the September incident. (*Id.*) However, neither Wallace nor Mason is similarly situated with Plaintiff for the following reasons.

### A. Same Supervisor

Throughout Plaintiff's employment, his direct supervisors included Godfrey and Reed, while Harvey was an upper-level supervisor in the plant manager position. (Harvey Dep., Doc. 27, Pg. ID 368; Reed Dep., Doc. 25, Pg. ID 298; Godfrey Dep., Doc. 35, Pg. ID 607-08.) As production supervisor for the D shift, Plaintiff directly supervised Wallace—the shift lead—and Mason—the floor lead. (Organizational Chart, Doc. 35-1, Pg. ID 633; Reed Dep., Doc. 25, Pg. ID 305.) Thus, Plaintiff did not share the same direct supervisor as Wallace or Mason; Plaintiff *was* the direct supervisor for Wallace and Mason.

The Court, however, also recognizes that Plaintiff, Wallace, and Mason were—at least at times—subject to the same ultimate decision-makers. For instance, Reed originally drafted disciplinary actions for all three in response to the September incident. (Reed Dep., Doc. 25, Pg. ID 315.) "[T]wo employees who are directly supervised by different individuals are not necessarily dissimilar if the same member of management disciplined both the plaintiff and the comparable employee." *Barry v. Noble Metal*

18

*Processing, Inc.*, 276 F. App'x 477, 481 (6th Cir. 2008); *see also McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (explaining that it may sometimes be appropriate to consider if the employees dealt with the same ultimate decision-maker, rather than the same supervisor). Thus, the Court continues its analysis with this consideration in mind.

### B. Same Standards

Plaintiff supervised both Wallace and Mason. District courts around the Sixth Circuit have frequently held that supervisees are not comparable to their supervisors for purposes of the similarly situated analysis. *See, e.g., Davis v. Ineos ABS (USA) Corp.*, No. 09-CV-773, 2011 WL 1114409, at *4 (S.D. Ohio. Mar. 24, 2011) (distinguishing between a non-supervisory plaintiff and supervisory comparators); *Quinn–Hunt v. Bennett Enters., Inc.*, No. 3:02-CV-195, 2005 WL 2174053, at *3 (N.D. Ohio. Sept. 7, 2005) ("Supervisory and non-supervisory employees are not similarly situated, and an employer may therefore justifiably treat such employees differently."); *Foust v. Metro. Sec. Servs., Inc.*, 829 F. Supp. 2d 614, 625 (E.D. Tenn. 2011) (same).

Moreover, in his role as production supervisor, Plaintiff was responsible for overseeing all operations on the D shift. (Johnson Decl., Doc. 36-2, Pg. ID 704.) To put it differently, Plaintiff was the "top person" present during the D shift. (Reed Dep., Doc. 25, Pg. ID 297.) His position included responsibilities, such as managing the production shift, ensuring belts operated smoothly, and escalating concerns to upper management when necessary. (Johnson Decl., Doc. 36-2, Pg. ID 704.) In contrast, the shift lead and floor lead each served as "right hands" to the production supervisor. (Godfrey Dep., Doc. 35, Pg. ID 611.) Plaintiff has not pointed to any evidence that a shift or floor lead is held to the

19

same standards as a production supervisor.

### C. Differentiating Circumstances

As the Sixth Circuit has consistently explained, "a plaintiff cannot establish a reasonable inference of discriminatory motive based on her 'employer's more severe treatment of more egregious circumstances.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.,* 814 F.3d 769, 777 (6th Cir. 2016) (quoting *Clayton v. Meijer, Inc.,* 281 F.3d 605, 612 (6th Cir. 2002)) (collecting cases); *see also Boughton v. Garland,* No. 1:19-CV-154, 2022 WL 912210, at *11 (S.D. Ohio Mar. 29, 2022) (explaining that an employer's treatment of different misconduct is a distinguishing factor, even if the plaintiff subjectively believes the other conduct to be more serious).

Here, Defendant disciplined Plaintiff, but ultimately not Wallace or Mason, for the September incident. (Reed Dep., Doc. 25, Pg. ID 315.) Wallace and Mason had unfulfilled duties that night. (*See* Discipline Draft for Wallace, Doc. 25-9, Pg. ID 337-38 (Wallace failed to complete tasks in control room); Discipline Draft for Mason, Doc. 25-9, Pg. ID 334-35 (Mason failed to complete tasks on the production floor.)) But, because Plaintiff held a different—and indeed, more senior—supervisory role in which he oversaw all of D shift and had responsibilities including escalation calls, this served as a reason to distinguish his conduct. *See, e.g., Boughton,* 2022 WL 912210, at *10 (explaining that a plaintiff's "supervisory position is a reasonable ground" for a defendant to distinguish its response to wrongdoing); *Johannes v. Monday Cmty. Corr. Inst.,* 434 F. Supp. 2d 509, 517 (S.D. Ohio 2006) (explaining that plaintiff was not similarly situated with employee in a "lower" position, despite sharing same supervisor). A production supervisor's escalation of any

20

period exceeding three hours of downtime served a purpose since the production manager was responsible for outlining certain production lapses, their root causes, and the actions taken to remedy the situations directly to the client. (Reed Dep., Doc. 25, Pg. ID 299-300.)

In assessing whether proposed comparators are similarly situated with a plaintiff, courts also consider "[d]ifferences in experience and disciplinary history." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016); *Robinson v. Quicken Loans, LLC*, No. 21-1392, 2022 WL 4234072, at *6 (6th Cir. Sept. 14, 2022). Plaintiff has not pointed to evidence in the record that Wallace or Mason shared a similar performance record or a comparable history of policy violations. As discussed above, Plaintiff received an unsatisfactory 2019 performance review, an attendance violation for requesting time off after his shift began, and a suspension for violating the COVID policy. This was all prelude to the September incident. Thus, Plaintiff has not offered evidence that he was similarly situated with Wallace or Mason from a prior performance or policy violation perspective. *See, e.g., Fort v. City of Columbus*, No. 2:20-CV-6423, 2022 WL 3647111, at *6 (S.D. Ohio Aug. 24, 2022) (distinguishing between employees based on prior discipline).

For all these reasons, Plaintiff's supervisees of Wallace of Mason do not serve as similarly-situated employees to show pretext.

### iii. Other Considerations of Pretext

Plaintiff points to other pieces of evidence in an effort to show age discrimination, but none of them—taken individually or collectively—are sufficient to create a genuine issue of material fact as to pretext. As mentioned, Plaintiff was replaced by Williams, who

is younger than Plaintiff by two decades. While this evidence sufficed at the prima facie stage, it is insufficient to show pretext under these circumstances. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 895 (6th Cir. 2020) ("That [defendant] replaced [plaintiff] with someone twenty years younger alone cannot establish a dispute as to pretext.").

Finally, Plaintiff points to Harvey's comment in which he stated, "Happy Birthday, Don, 57?" (Forte Dep., Doc. 23, Pg. ID 172.) Harvey made this comment to Plaintiff in the break room with other people around, and it was made during Plaintiff's birthday month. (*Id.*) But, isolated and ambiguous comments like this single one do not adequately support a finding of pretext here. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998) ("Isolated and ambiguous comments are too abstract . . . to support a finding of age discrimination.") (cleaned up).

For all these reasons, even taking Plaintiff's account as true and making reasonable inferences in his favor, no reasonable juror could find that Plaintiff has demonstrated pretext. Summary judgment is appropriate when "the plaintiff creates 'only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.'" *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 350 (6th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). Thus, summary judgment is granted in Defendant's favor as to Plaintiff's age discrimination claims.

## II.     Retaliation Claim

Defendant next moves for summary judgment on Plaintiff's retaliation claim under Ohio law. Ohio Revised Code § 4112.02(I) prohibits any person from discriminating against another for opposing any unlawful discriminatory practice. Given the similarity between Ohio's retaliation statute and Title VII under federal law, "courts have held that '[f]ederal law provides the applicable analysis for reviewing retaliation claims' brought under Ohio Revised Code § 4112.02(I)." *Braun v. Ultimate Jetcharters, LLC,* 828 F.3d 501, 510 (6th Cir. 2016) (quoting *Baker v. Buschman Co.,* 713 N.E.2d 487, 491 (Ohio Ct. App. 1998)). Parallelling the preceding age discrimination analysis, *McDonnell Douglas* burden-shifting provides the framework for a retaliation claim supported by indirect evidence. *See id.*

### 1.  Prima Facie Case

To establish a prima facie case of unlawful retaliation, a plaintiff must demonstrate that: (1) "he engaged in a protected labor activity under Ohio or federal law," (2) "his engagement in protected activities was known to the defendant," (3) the "defendant took an employment action adverse to plaintiff," and (4) "there was a causal connection between the protected activity and the adverse employment action." *Braun,* 828 F.3d at 510 (quotation omitted). Defendant argues that Plaintiff has failed to establish all four prongs of a prima facie case. (Motion, Doc. 36, Pg. ID 692.) The Court considers each in turn.

i.       **Protected Labor Activity**

For purposes of the first element of the prima facie case of retaliation, protected activity includes an employee's opposition to an employer's unlawful practice. *Braun*, 828 F.3d at 511. Notably, an employee need not show that the practice was in fact unlawful — only that he had "a good faith belief that the practice [was] unlawful." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312–13 (6th Cir. 1989). And, while "vague complaints do not constitute opposition," an employee is not required to lodge a complaint with "absolute formality, clarity, or precision." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (quotation omitted).

Defendant argues that Plaintiff's complaints concerned management practices rather than specific allegations about unlawful employment discrimination. (Motion, Doc. 36, Pg. ID 692-93.) However, Plaintiff testified in his deposition that he complained to upper management about racially offensive language in the workplace multiple times. Plaintiff first framed his complaints to Harvey in an attempt to promote a respectful workplace and to address "harassing language" that created an "intimidating atmosphere." (Forte Dep., Doc. 23, Pg. ID 175, 226.) According to Plaintiff, he was cut off by Harvey, who said, "I listen to Tupac too." (*Id.* at Pg. ID 170, 226.) In further attempts to address such language, Plaintiff later brought it to the attention of Maggie Rindler, who worked in human resources. (*Id.* at Pg. ID 175, 204, 214-15.) Plaintiff then made Reed, his new manager, aware of his concern. (*Id.* at Pg. ID 215.) Reed responded that "they've been talking that way around here for years." (*Id.* at Pg. ID 175, 215.) Godfrey also recalls times when Plaintiff brought up certain language used in the workplace, but Plaintiff

testified that he did not raise concerns of racial language to Godfrey. (Godfrey, Doc. 35, Pg. ID 621; Forte Dep., Doc. 23, Pg. ID 213.)

"Reporting or complaining of racist conduct to management . . . constitutes protected conduct." *Jordan v. Mathews Nissan, Inc.*, 539 F. Supp. 3d 848, 891 (M.D. Tenn. 2021); *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 654-56 (6th Cir. 2012), *as amended* (Oct. 17, 2012) (explaining that plaintiff could have engaged in protected activity, "even though those comments were not directed at [him] personally" and that "the comments did upset [plaintiff], insofar as he sought out [his employer] to voice his concerns"); *Willis v. Camco Chem. Co.*, No. 221-CV-78, 2022 WL 6778292, at *8 (E.D. Ky. Oct. 11, 2022). On this record, the Court proceeds under the assumption that a juror could reasonably find that Plaintiff engaged in protected activity by reporting the use of racial slurs and intimidating language on multiple occasions.

### ii. Defendant Knew Plaintiff Engaged in Protected Activity

Turning to the second element, Plaintiff must proffer "evidence sufficient to establish that the individuals charged with taking the adverse employment action knew of" Plaintiff's protected activity. *Braun*, 828 F.3d at 512 (quotation omitted). Reed and Harvey were both involved in Plaintiff's termination. (Termination Letter, Doc. 23-11, Pg. ID 263; Harvey Dep., Doc. 27, Pg. ID 383.) Since Plaintiff made the aforementioned complaints to Harvey, Rindler, and Reed, a reasonable juror may find that Defendant knew of such protected conduct.

### iii.    Adverse Action

"An employment action is 'materially adverse' if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination,' even if it does not strictly affect the terms, conditions, or status of the plaintiff's employment." *Boughton v. Garland*, No. 1:19-CV-154, 2022 WL 912210, at *16 (S.D. Ohio Mar. 29, 2022) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006)). Plaintiff received three disciplinary actions after making his complaint to Reed, which led to Plaintiff's termination. Thus, the third element is satisfied.

### iv.    Causation

Turning to the fourth element, a plaintiff "must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in [the protected activity]." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003). Though the Sixth Circuit has "generally caution[ed] against the permissibility of drawing an inference of causation from temporal proximity alone, . . . '[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.'" *Barrow v. City of Cleveland*, 773 F. App'x 254, 263 (6th Cir. 2019) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

Plaintiff contends that the causal prong is satisfied because he received three disciplinary actions within three months of complaining to Reed about the racially offensive language. (Response, Doc. 46, Pg. ID 847-48.) While Plaintiff notified Reed about this language soon after Reed became his supervisor, it is unclear when this conversation exactly took place. (Forte Dep., Doc. 23, Pg. ID 215.) Plaintiff testified that this conversation may have occurred as early as June 2020. (*Id.*) Plaintiff was then disciplined for policy violations that took place in June 2020, July 2020, and September 2020, which ultimately led to his termination. (Termination Letter, Doc. 23-11, Pg. ID 263.) The Sixth Circuit has held that an employer who takes an adverse action against a plaintiff a few months after learning of the plaintiff's protected activity can demonstrate causation for prima facie purposes. *See, e.g., Stein v. Atlas Indus., Inc.*, 730 F. App'x 313, 319 (6th Cir. 2018) (demarcating the cutoff for temporal proximity alone satisfying causation around the ten-week mark); *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 664-65 (6th Cir. 2020) (collecting cases).

The Court also notes that Plaintiff first complained of racially offensive language to Harvey soon after starting in May 2018. (Forte Dep., Doc. 23, Pg. ID 169-70.) While Plaintiff testified that Harvey was involved in the "campaign" against him, Plaintiff was not terminated until September 2020—over two years after Plaintiff made his complaint to Harvey. (*Id.* at Pg. ID 205.) However, in light of the timeframe pertaining to Reed, the Court will assume for present purposes that a reasonable juror may find a causal connection as to the fourth and final element. The burden now shifts back to Defendant.

27

**2. Legitimate Reason for Adverse Action**

As explained in the age discrimination analysis, Defendant's cited reason of Plaintiff's poor performance and policy violations constitutes a legitimate reason for termination. The burden therefore turns back to Plaintiff to show why this proffered reason is merely pretext for retaliation.

**3. Pretext**

Plaintiff clarifies that the arguments for pretext as to his age discrimination claim are largely applicable to his retaliation claim too. (Response, Doc. 46, Pg. ID 848.) While it is unnecessary to rehash those arguments previously examined, the Court addresses one with a new spin: that Defendant subjected Plaintiff to disproportionate discipline due to retaliation.

Specifically, Plaintiff relies on the case of *Hamilton v. General Electric Company* for the proposition that "when an employer waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute the very definition of pretext." 556 F.3d 428, 436 (6th Cir. 2009) (cleaned up). However, in *Hamilton* and its progeny, the Sixth Circuit has emphasized that the plaintiff in those cases adequately contested the factual basis for the termination. *Id.* at 436-37; *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012); *Bargo v. Goodwill Indus. of Kentucky, Inc.*, No. 12-CV-221, 2014 WL 7359047, at *7 (E.D. Ky. Dec. 23, 2014) (highlighting this distinction). As Defendant points out, Plaintiff has admitted to his material violations here. (Reply, Doc. 47, Pg. ID 883.)

Moreover, as explored in the preceding analysis for pretext in the age discrimination claims, Plaintiff has not offered evidence of receiving closer scrutiny than comparable employees. At the end of the day, "merely being disciplined is not enough to establish a genuine issue of material fact; rather, showing 'that the scrutiny *increased* is critical.'" *Findley v. United Parcel Serv.*, 433 F. App'x 391, 394 (6th Cir. 2011) (quoting *Hamilton*, 556 F.3d at 436); *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010) (distinguishing the matter from *Hamilton* since plaintiff did not provide evidence of receiving closer scrutiny). Specifically, Plaintiff has not pointed to evidence that he experienced increased scrutiny in the realm of attendance policy, COVID policy, the escalation duties of a production supervisor, or otherwise.

It is also worth mentioning that Plaintiff received coaching and a warning for policy violations, as well as an unsatisfactory performance review, before he complained to Reed about the racially offense language. *See Liebau v. Dykema Gossett, PLLC*, No. 23-1301, 2024 WL 1739750, at *9 (6th Cir. Apr. 23, 2024) ("[T]he fact that supervisors continued to document perceived issues with [plaintiff's] performance after her complaint does not reflect the illicit retaliation described in *Hamilton*.").

With this reasoning in mind, and knowing that "temporal proximity cannot be the sole basis for finding pretext," *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012), the Court concludes that no reasonable juror could find pretext. Accordingly, the Court grants summary judgment for Defendant as to Plaintiff's retaliation claim.

## CONCLUSION

For all these reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 36). This case is hereby **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND